Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, JOHN TASKER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN TASKER, on behalf of himself and all similarly situated persons, | Case No: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **1) CAL. PENAL CODE § 638.51** |
| NIKE, INC., an Oregon corporation, | |
| Defendants. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff JOHN TASKER ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant NIKE, INC., an Oregon corporation ("Defendant" or "NIKE"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.nike.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol (IP) addresses, session data, clickstream activity, and form inputs in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5.    When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.    When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Ads / DoubleClick Tracker

- Microsoft Bing Ads

- Facebook Tracker

- The Trade Desk Tracker

7.    The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.    The Trackers are operated by distinct third parties, including: Google LLC (as to the Google Ads/DoubleClick Tracker), Microsoft Corporation (as to the Microsoft Bing Ads Tracker), Meta Platforms, Inc. (as to the Facebook Pixel Tracker), and The Trade Desk, Inc. (as to the Trade Desk Tracker) (collectively, the "Third Parties"). Defendant aids, employs, agrees, and conspires with these Third Parties by enabling their trackers, which transmit user data to third-party servers for the purpose of identifying users and supporting advertising, profiling, cross-device tracking, and data monetization activities.

9.    On information and belief, the Website employs other trackers not identified above including but not limited to the TikTok, Brightcove, MPulse, New Relic, SnapChat, Reddit and Pinterest trackers, among others.

10.    Through the Trackers, Third Parties collect a wide range of routing, addressing, and signaling information from users' browsers and devices without their

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

knowledge or consent. This includes IP addresses; browser and device type; operating system; screen resolution; timezone; unique identifiers (such as cookies and advertising IDs); device fingerprinting attributes (such as installed fonts and plugins, color depth, graphics and audio rendering characteristics, CPU and memory capacity, and battery or network state); and behavioral telemetry (such as navigation paths, referrer URLs, session duration, scroll depth, mouse movements, clicks, taps, and video interactions). Trackers also derive approximate geolocation from users' IP addresses. Collectively, this data ("User Information") is used for behavioral profiling, location tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then exploits the User Information collected by the Trackers—acting jointly with the Third Parties operating them—for targeted marketing and advertising that monetize the Website. In doing so, Defendant and the Third Parties benefit from the unconsented-to collection and commercial use of Plaintiff's and Class Members' personal information.

11.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other categories of User Information, they operate as "pen registers" and/or "trap and trace devices" within the meaning of Cal. Penal Code § 638.50. These technologies silently collect routing and addressing information for commercial purposes without the user's knowledge, consent, or interaction. Courts have recognized that such conduct falls within the scope of CIPA's prohibitions. *See, e.g., Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.     The invasiveness of the tracking alleged here is amplified by the entities operating the trackers—Google (Ads/DoubleClick), Microsoft (Bing Ads), Meta (Facebook), The Trade Desk, TikTok, Brightcove, MPulse, New Relic, SnapChat, Reddit, and Pinterest. Each of these companies combines the IP addresses and user information it collects from visitors to the Website with information obtained from numerous other sources. By merging these data points, they generate comprehensive

user profiles that extend across platforms and browsing sessions. These enriched profiles are then used to track Plaintiff and Class Members across the Internet, facilitating behavioral profiling, cross-device tracking, and predictive modeling. The resulting profiles are shared with advertisers and leveraged within programmatic ad networks to deliver more targeted and tailored advertising, based on a broad and continuously expanding universe of information.

13.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

14.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

16.    Plaintiff JOHN TASKER is a California citizen residing in San Bernardino County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17.    Defendant NIKE, INC. is an Oregon corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    NIKE, Inc. is one of the world's largest athletic footwear and apparel companies, incorporated in Oregon with global headquarters in Beaverton, Oregon. As of 2025, NIKE sells its products and services to consumers worldwide through retail stores, online platforms, mobile apps, and other digital experiences.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

19.    NIKE employs tens of thousands of people globally. Its core business revolves around designing, manufacturing, marketing, and selling footwear, apparel, equipment, and accessories, as well as offering fitness-related digital services and membership programs through its comprehensive platform.

20.    The Website is the cornerstone of NIKE's global digital ecosystem and serves as a full-service online platform. It allows customers to browse and purchase a wide variety of NIKE products, access exclusive launches, manage memberships, and engage with personalized digital experiences.

21.    The Website is also deeply integrated into NIKE's membership programs, marketing campaigns, and global brand ecosystem, offering services such as integration with mobile apps and partner platforms. Nike.com functions not just as an e-commerce site, but as a data collection and customer engagement hub, enabling advanced personalization and targeted advertising based on users' preferences, purchase history, and online activity.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

23.    This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

24.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has

intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

## IV.    GENERAL ALLEGATIONS

**1.    *The California Invasion of Privacy Act (CIPA)***

25.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

26.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

27.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

28.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents (Cal. Penal Code § 638.50(b)).

29.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

30.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

31.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

32.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, capturing the incoming information.

33.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.  This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced

1    with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19
2    (N.D. Cal. Aug. 12, 2016).

3    34.    The conduct alleged herein constitutes a violation of a legally protected
4    privacy interest that is both concrete and particularized. Invasions of privacy have long
5    been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir.
6    2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).)

7    35.    Both the legislative history and statutory language indicate that the
8    California Legislature intended CIPA to protect core privacy rights. Courts have found
9    that violations of CIPA give rise to concrete injuries sufficient to confer standing under
10    Article III. (*See Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet
11    Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).)

12    36.    Individuals may pursue legal action against violators of any CIPA
13    provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties
14    per violation (Cal. Penal Code § 637.2(a)(1)).

15    **2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

16    37.    When the Plaintiff and Class Members accessed the Website, their browsers
17    initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which
18    hosts the content and functionality of the site. In response, the server transmitted an
19    HTTP response containing the necessary resources, including HTML, cascading style
20    sheets (CSS), JavaScript files, and image assets, used by the browser to render and
21    display the webpage. These resources also included client-side scripts that initiate
22    communication with third-party services for analytics, marketing, and tracking purposes.
23    The server's instructions include how to properly display the Website, *e.g.* what images
24    to load, what text should appear, or what music should play.

25    38.    In addition, the server's instructions included client-side scripts that initiate
26    communication with third-party services for analytics, marketing, and tracking purposes.
27    The instructions cause the Trackers to be installed on a user's browser. The Trackers
28    then cause the browser to send identifying information—including the user's IP address

and User Information to the Third Parties.  These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

39.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



40.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

41.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

42.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

43.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

44.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.   IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

45.    Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

46.    Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city,

---

[1]    *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

47. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

48. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

49. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

50.    The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**<u>Figure 2:</u>**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

51.    Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

52.   A public IP address is therefore "routing, addressing, or signaling information."   A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

53.   As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

54.   A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

55.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

56.     Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

57.     A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7]   Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

58.     In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]   For example,

---

[4]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9]  Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10]  *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

59.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

60.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

61.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

62.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

---

[11]  *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12]  *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13]  *Id.*

[14]  Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi ams-z7bhf.

[15]  *Id.*

[16]  *Id.*

[17]  *Id.*

16

63.     The collection of IP addresses here is particularly invasive here:  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

64.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

65.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

66.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.
[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en
[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

67. Often times, third-party scripts are installed on websites "for advertising purposes."[21]

68. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

69. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

70. As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

71. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

72. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers

---

are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[21] *Id.*
[22] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

73.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**3.     *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

74.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

75.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

76.     This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used

to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

77.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

78.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

79.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

80.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

81.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.     *Plaintiff And Class Members' Data Has Financial Value***

82.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

83.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

84.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

85.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/-?sh=26481de07444
[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).
[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.
[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

21

86.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

87.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

88.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

89.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf
[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.** ***Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

90.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

91.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

92.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent

user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

93.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### 6.    *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

94.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

95.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

96.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

97.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device

Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a. Data Brokers And Real-Time Bidding: The Information Economy

#### Data Brokers

98.  While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

99.  Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a).

100.  "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

---

[29] Justin Sherman, Duke Sanford Cyber Policy Program, Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy, at 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.
[30] Sherman, *supra*, at 2.
[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: Proceedings of the 2015 ACM on Conference on Online Social Networks 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

25

101.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

102.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

103.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

104.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use

---

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id.*
[35] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many

industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

105. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

/ / /

---

[36] *Id.*
[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**<u>Figure 4:</u>**



106.    As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

/ / /

/ / /

---

[38] *Id.* at 11.

107.  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

108.  These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

109.  In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

110.  As a result of Defendant's installation of trackers operated by data brokers and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles already maintained about them—or used to generate new profiles—through the collection of their IP addresses, device metadata, and other user information from the browsers of Defendant's Website.

111.  These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

112.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

113.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

114.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP work[s] with website or app publishers to help them participate in the RTB process."  "DSPs [which is what the Trade Desk is[42]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[43]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[44]

115.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like Trade Desk help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

116.   The RTB process works as follows:

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[42] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").
[43] *Id.*
[44] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

30

After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[45]

**Figure 5:**



117.  Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.  These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them

---

[45] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[46]

**Figure 6:**



118. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

119. Likewise, a DSP like Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about

---

[46] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

120.    All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

121.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> b.    "send[ing] sensitive data across geographic borders."
>
> c.    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[47]

122.    Given Trade Desk operates a DSP here, the last point is particularly relevant, as it means Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement.  This greatly diminishes the ability of users to control their personal information.

123.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[48]

---

[47] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[48] Geoghegan, *supra*.

124.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[49]:

**Figure 7:**



125.  All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

/ / /

---

[49] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

*Cookie Syncing*

126.   It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).   The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

127.   Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[50]  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[51]

128.   Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.   Thus, advertiser.com does not (and cannot) know which users visit website3.com.   However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

---

[50] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[51] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[52]

**Figure 8:**



129.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[53]

/ / /

---

[52] Papadopoulos, *supra*, at 1433.
[53] Papadopoulos, *supra*, at 1434.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

130.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[54]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[55] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.  Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[56]

131.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[57]

132.    Cookie syncing is precisely what is happening here.  When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website (*e.g.*, Experian, Epsilon, TransUnion, the Third Parties between one another).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from actually being anonymous when they visit the Website.

133.    To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same.  The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst

---

[54] *Id.*
[55] *See id.*
[56] *Id.*
[57] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

134.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

135.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

136.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

137.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

138.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

139.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

140.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

141.   The Trade Desk performs identity enrichment and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in identifier syncing across advertising networks, these entities create detailed, persistent user profiles that extend beyond a single browsing session or device. The Trade Desk utilizes frameworks like Unified ID 2.0 to map users across domains.   These practices convert raw behavioral data collected on the Website into monetizable, targetable audience segments within the programmatic advertising ecosystem.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# V.   SPECIFIC ALLEGATIONS

## 1.   The Google Ads/DoubleClick Tracker

142.   The Google Ads/DoubleClick Tracker is a script and tracking pixel delivered through Google's advertising infrastructure and embedded into the Website to measure and analyze user engagement. When a user visits the Website, the Google Ads/DoubleClick Tracker automatically activates, capturing data such as page views, page URLs, referral sources, timestamps, advertising identifiers, and associated metadata including IP address, device type, operating system, and browser specifications. This data may be linked to a user profile (when logged in or otherwise identifiable) or associated via device/browser fingerprinting to create a persistent behavioral profile.

143.   By transmitting this activity data, the Google Ads/DoubleClick Tracker enables Defendant and Google to perform identity resolution by connecting on-site actions to specific users or inferred visitor segments. This allows advanced advertising functions such as retargeting, for example showing users personalized promotions after they have browsed product pages. Defendant also uses this aggregated data to optimize campaign performance, build "lookalike" audiences with similar interests, and improve personalization across its marketing channels. These capabilities monetize user data by boosting ad relevance, increasing conversion rates, and providing advertisers with valuable insights into consumer behavior across a broad ecosystem of sites.

144.   Figure 9 is a screenshot showing a Chrome DevTools capture of automatic requests to www.googletagmanager.com that load Google's Tag Manager and initiate downstream calls to DoubleClick advertising endpoints. These requests were triggered on page load without user interaction, providing evidence that the Website immediately initiated connections with Google's tracking infrastructure.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 9:**



145. Figure 10 is a Fiddler capture of a GET request to 4171764.fls.doubleclick.net/activityi, including query string parameters such as language (u1=us, u2=en_us), page context (u3=homepage), advertising identifiers (auiddc), and the referrer (https://www.nike.com/). This confirms that the Website transmitted routing and behavioral data to Google in real time, enabling DoubleClick to map the user's session and activity.

/ / /

/ / /

/ / /

/ / /

/ / /

41

**Figure 10:**



146. Figure 11 is a Chrome DevTools capture of additional DoubleClick requests to googleads.g.doubleclick.net and stats.g.doubleclick.net. These endpoints confirm that DoubleClick's Floodlight tags and beacon requests were automatically fired, transmitting user metadata for conversion tracking, audience segmentation, and ad attribution.

**Figure 11:**



147. Figure 12 is a Fiddler capture of a GET request

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

to adservice.google.com/ddm/fls/z/.... The request parameters reveal transmission of the user's IP address, referrer URL, user-agent string, and timestamp. This illustrates how the DoubleClick infrastructure collects dialing, routing, addressing, and signaling information contemporaneously with user activity on the Website, linking it into Google's global ad exchange for profiling and retargeting purposes.

**Figure 12:**



148. Defendant surreptitiously installed, executed, embedded, or injected the Google Ads/DoubleClick Tracker onto users' browsers by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code, which triggers network requests that send data about the user's interactions, including the user's IP address, to Google's servers as part of third-party tracking and advertising infrastructure.

149. The Google Ads/DoubleClick Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

150. The Google Ads/DoubleClick Tracker is at least a "device" because in order for software to function, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co., 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

151.    The Google Ads/DoubleClick Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

152.    Through this process, the Google Ads/DoubleClick Tracker systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

153.    Moreover, by embedding the Google Ads/DoubleClick Tracker onto the Website, Defendant enabled Google to track users' activity beyond the Website itself. The Tracker assigns persistent identifiers that allow Google to monitor user behavior across multiple unrelated websites that deploy DoubleClick technology. As a result, Google is able to compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

154.    The Google Ads/DoubleClick Tracker initiates a connection to Google's advertising servers (such as securepubads.g.doubleclick.net and fls.doubleclick.net) upon page load. This connection transmits routing and signaling metadata, including the user's IP address, user-agent string, full URL path, referrer header, and timestamp. These data points enable Google to identify both the source and destination of the communication, facilitate user ID synchronization across sites, and support the construction of cross-site user profiles for targeted advertising and audience segmentation. Accordingly, the Google Ads/DoubleClick Tracker functions as a pen register and/or trap and trace device and/or process.

155.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Google Ads/DoubleClick Tracker or to collect or share

data with Google.

156.   Defendant's secret installation of the Google Ads/DoubleClick Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 2.    The Microsoft Bing Ads Tracker

157.   The Microsoft Bing Ads Tracker is a script and beacon embedded into the Website that collects and transmits behavioral and technical data to Microsoft's advertising infrastructure. When a user visits the Website, the Bing Ads Tracker automatically activates, capturing information such as page views, page URLs, referral sources, timestamps, advertising identifiers, and associated metadata including IP address, device type, operating system, and browser specifications. This information can be linked to user or device profiles and combined with Microsoft's cross-platform data sources to create persistent behavioral profiles.

158.   By transmitting this data, the Bing Ads Tracker enables Defendant and Microsoft to perform identity resolution by connecting on-site actions to specific users or inferred visitor segments. This supports advanced marketing functions such as retargeting and audience modeling, and allows aggregated Website data to be used to optimize campaign performance, build "lookalike" audiences, and integrate visitors into Microsoft's broader advertising ecosystem.

159.   Figure 13 is a Chrome DevTools capture showing automatic requests to https://bat.bing.com/action/... triggered on page load without any user interaction. The request parameters include unique identifiers and session fields such as ti, mid, sid, locale and language codes, screen and viewport dimensions, keyword/context values, and a referrer parameter pointing back to the Website—demonstrating that Microsoft receives behavioral and routing data as soon as the page loads.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 13:**

2



3

4

5

6

7

8

9

10

11

12

13    160.    Figure 14 is a Fiddler capture of the same bat.bing.com/action call. The

14    request headers include the user-agent string (browser and operating system), sec-

15    ch device attributes, and the referrer set to the Website, confirming transmission of

16    dialing, routing, addressing, and signaling information in real time. The response further

17    sets Bing/Microsoft cookies, evidencing establishment of a persistent identifier for

18    ongoing tracking.

19

20    / / /

21

22    / / /

23

24    / / /

25

26    / / /

27

28    / / /

46

**Figure 14:**



161.  Figure 15 is a screenshot of the browser's Application storage showing a uetvid cookie associated with Microsoft's Universal Event Tracking (UET). This persistent identifier ties repeated visits and actions to the same browser, enabling cross-session and cross-site tracking within Microsoft's advertising graph.

**Figure 15:**



CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

162.    Defendant surreptitiously installed, executed, embedded, or injected the Bing Ads Tracker onto users' browsers by adding Microsoft's JavaScript code to the Website. When a user visits the Website, their browser executes this code, which triggers network requests that send data about the user's interactions—including the user's IP address—to Microsoft's servers as part of third-party tracking and advertising infrastructure.

163.    The Bing Ads Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

164.    The Bing Ads Tracker is at least a "device" because in order for software to function, it must be run on a computing device. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

165.    The Bing Ads Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details and is sufficient to reconstruct user activity.

166.    Through this process, the Bing Ads Tracker systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

167.    By embedding the Bing Ads Tracker on the Website, Defendant enabled Microsoft to track user activity beyond the Website itself. The Tracker assigns persistent identifiers that allow Microsoft to monitor user behavior across multiple unrelated websites that deploy Microsoft's UET and related technology. As a result, Microsoft can compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet—further exacerbating the privacy invasion.

168.    The Bing Ads Tracker initiates a connection to Microsoft's advertising

servers (typically bat.bing.com) upon page load. This connection transmits routing and signaling metadata—including the user's IP address, user-agent string, full URL path, referrer header, timestamps, and persistent identifiers—enabling Microsoft to identify both the source and destination of the communication, synchronize user IDs across sites, and construct cross-site profiles for targeted advertising and audience segmentation. Accordingly, the Bing Ads Tracker functions as a pen register and/or trap-and-trace device and/or process.

169.   Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or Class Members' consent to install the Bing Ads Tracker or to collect or share their data with Microsoft.

170.   Defendant's secret installation of the Bing Ads Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap-and-trace device without prior consent or court order.

### 3.   *The Facebook Tracker*

171.   The Facebook Tracker (often implemented through the "Meta Pixel" or fbevents.js) is embedded into the Website and automatically transmits user interaction data to Facebook's advertising infrastructure. When a visitor loads the Website, the Tracker immediately activates and begins collecting data such as page views, full URLs, referral sources, timestamps, advertising identifiers, and associated metadata including IP address, device type, operating system, and browser specifications. This information is tied to persistent identifiers (such as the _fbp cookie) and enables Facebook to connect Website activity with its extensive social graph, creating highly detailed behavioral profiles.

172.   By transmitting this data, the Facebook Tracker enables Defendant and Facebook to perform identity resolution, connect on-site actions to individual users (whether logged into Facebook or not), and feed that activity into Facebook's ad-targeting and attribution systems. This functionality allows for retargeting, optimization

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

of advertising campaigns, and the creation of "custom audiences" and "lookalike audiences" based on Website visitors' behavior.

173. Figure 16 is a screenshot showing automatic requests to connect.facebook.net loading the fbevents.jsscript. This script initializes Facebook's tracking pixel, which then fires subsequent network requests without any user interaction, confirming that the Facebook Tracker is embedded and activated on page load.

**<u>Figure 16:</u>**



174. Figure 17 shows a capture where a request to www.facebook.com/tr?id=... was triggered, sending parameters that included the pixel ID, event type (PageView), and the full referrer URL of the Website. This demonstrates that Facebook received real-time data linking Website activity to its advertising infrastructure.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 17:**



175.    Figure 18 is a capture of a facebook.com/tr request, which transmits non-content metadata directly to Facebook. The request headers reveal the Referrer (https://www.nike.com/), linking the communication to the Website; the User-Agent string and sec-ch-ua values, identifying the user's browser, operating system, and device; and the Accept-Language header, signaling locale preferences. The query string parameters further include the pixel ID, event type (PageView), document location (dl=), and timestamp, all of which provide Facebook with routing and signaling details about when and how the communication occurred. Collectively, these fields demonstrate that the Facebook Tracker transmitted dialing, routing, addressing, and signaling information to Facebook's servers, enabling Facebook to identify both the source of the communication (the Website) and the technical characteristics of the user's device and browsing session.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 18:**

2



13    176.   Figure 19 is a Wireshark capture showing DNS queries from the user's

14    device to resolve Facebook tracking domains. The capture records lookups

15    to connect.facebook.net and www.facebook.com, with responses pointing to

16    Facebook's content delivery and advertising infrastructure. These DNS records confirm

17    that the Website triggered the user's device to initiate communications with Facebook's

18    servers, revealing the source IP address of the user, the requested destination domains,

19    and the routing path necessary to complete the connection. This exchange constitutes

20    dialing, routing, addressing, and signaling information because it identifies both the

21    origin of the communication (the user's device) and the intended destination

22    (Facebook's servers), demonstrating that Facebook received technical metadata in real

23    time as part of the tracking process.

24    / / /

25

26    / / /

27

28    / / /

52

**Figure 19:**



177.    Defendant surreptitiously installed, executed, embedded, or injected the Facebook Tracker onto users' browsers by adding the fbevents.js JavaScript code snippet to the Website. When a user visits the Website, their browser executes this code, which triggers network requests that send data about the user's interactions—including the user's IP address—to Facebook's servers as part of third-party tracking and advertising infrastructure.

178.    The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

179.    The Facebook Tracker is at least a "device" because in order for software to function, it must be run on a computing device. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

180.    The Facebook Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

181.    Through this process, the Facebook Tracker systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

182.    By embedding the Facebook Tracker onto the Website, Defendant enabled Facebook to track users' activity beyond the Website itself. The Tracker assigns

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

persistent identifiers that allow Facebook to monitor behavior across any other site that also deploys the Facebook Pixel. As a result, Facebook can compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site surveillance exacerbates the privacy invasions resulting from Defendant's conduct.

183.   The Facebook Tracker initiates connections to Facebook's advertising servers (such as connect.facebook.net and facebook.com/tr) upon page load. These connections transmit routing and signaling metadata, including the user's IP address, user-agent string, full URL path, referrer header, and timestamp. These data points enable Facebook to identify both the source and destination of the communication, synchronize user IDs across sites, and support the construction of cross-site profiles for targeted advertising and audience segmentation. Accordingly, the Facebook Tracker functions as a pen register and/or trap and trace device and/or process.

184.   Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Facebook Tracker or to collect or share data with Facebook.

185.   Defendant's secret installation of the Facebook Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**4.    *The Trade Desk Tracker***

186.   The Trade Desk Tracker is embedded into the Website through scripts and redirect calls that connect directly to The Trade Desk's ad-serving and identity infrastructure. When a user visits the Website, the Trade Desk Tracker activates automatically, collecting data such as page views, referral URLs, timestamps, advertising identifiers, IP addresses, device type, operating system, and browser specifications. This information is used to identify users across sessions and devices,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

integrate Website activity into The Trade Desk's programmatic advertising exchange, and enrich user profiles by syncing identifiers with other advertising networks.

187.   By transmitting this information, the Trade Desk Tracker enables Defendant and The Trade Desk to perform identity enrichment and cross-device tracking. This includes syncing identifiers across multiple advertising platforms, mapping user behavior across unrelated sites, and linking Website activity with pseudonymous identifiers. These functions allow The Trade Desk to generate persistent profiles that extend far beyond a single browsing session, enabling retargeting and behavioral targeting across the open web.

188.   Figure 20 is a capture showing a request to js.adsrvr.org, which loads Trade Desk's tracking script directly into the user's browser upon visiting the Website. The request demonstrates that the Website embeds Trade Desk's JavaScript library, which then initiates further tracking calls without user interaction.

**Figure 20:**



189.   Figure 21 is a capture of a GET request to match.adsrvr.org/track/..., which includes query string parameters such as advertiser_id, cookie_sync=1, and

a referrer=https://www.nike.com/. The headers confirm the user's IP address, user-agent string, sec-ch device metadata, and referrer field, evidencing transmission of routing, addressing, and signaling information. This request also confirms that identifier syncing was attempted, linking the user's Website activity to Trade Desk's broader identity framework and advertising graph.

**Figure 21:**



190.    Defendant surreptitiously installed, executed, embedded, or injected the Trade Desk Tracker onto users' browsers by adding The Trade Desk's JavaScript code to the Website. When a user visits the Website, their browser executes this code, which triggers network requests that send data about the user's interactions—including the user's IP address—to The Trade Desk's servers as part of third-party tracking and advertising infrastructure.

191.    The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

192.    The Trade Desk Tracker is at least a "device" because in order for software to function, it must be run on some kind of computing device. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

193.    The Trade Desk Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

194.    Through this process, the Trade Desk Tracker systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

195.    By embedding the Trade Desk Tracker onto the Website, Defendant enabled The Trade Desk to track user activity beyond the Website itself. The Tracker assigns persistent identifiers that allow The Trade Desk to monitor behavior across multiple unrelated websites that deploy its technology. As a result, The Trade Desk is able to compile detailed, longitudinal behavioral profiles of users based not only on their interactions with the Website, but also on their broader browsing activities across the internet. This cross-site surveillance exacerbates the privacy invasions resulting from Defendant's conduct.

196.    The Trade Desk Tracker initiates connections to Trade Desk's advertising servers (such as js.adsrvr.org and match.adsrvr.org) upon page load. These connections transmit routing and signaling metadata, including the user's IP address, user-agent string, referrer headers, timestamps, and cross-site identifiers. These data points enable The Trade Desk to identify both the source and destination of the communication, synchronize user IDs across advertising networks, and support the construction of cross-site profiles for targeted advertising and audience segmentation. Accordingly, the Trade Desk Tracker functions as a pen register and/or trap and trace device and/or process.

197.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Trade Desk Tracker or to collect or share data with The Trade Desk.

198.   Defendant's secret installation of the Trade Desk Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

## VI.   <u>CLASS ALLEGATIONS</u>

199.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

200.   **NUMEROSITY:**   Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

201.   **COMMONALITY:**   Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

202.   **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

203.   **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

204.   **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.   <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

205.   Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

206.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

207.   Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

208.   Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Disgorgement of profits resulting from unjust enrichment;

6. Statutory damages pursuant to CIPA;

7. Prejudgment interest;

8. Reasonable attorney's fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Dated:   September 10, 2025        Respectfully submitted,

**NATHAN & ASSOCIATES, APC**


By:  */s/ Reuben D. Nathan*
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED